## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

RICHARD KELLEY HARTE

v.                                                              CASE NO. 4:11cv351-RH/WCS

CITY OF TALLAHASSEE, A Florida
Municipality, And JEFF MAHONEY,
Individually,

      Defendants.
_____/

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff, RICHARD KELLEY HARTE, by and through his undersigned attorney, and sues Defendant, CITY OF TALLAHASSEE, a Florida Municipality, and Defendant, JEFF MAHONEY, Individually, pursuant to Title 42 U.S.C. §§ 1983 and 1988, for violations of RICHARD KELLEY HARTE'S civil rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and certain common law claims actionable in the State of Florida, and enforceable against municipalities of the State of Florida pursuant to §768.28, Florida Statutes, and states:

## I.  JURISDICTION AND VENUE

1.      This case was initially filed in the Circuit Court of the Second Judicial Circuit In And For Leon County, Florida (Case Number 2011-CA-621) which had original jurisdiction over certain of the common law tort claims, and concurrent subject matter jurisdiction over the claims brought pursuant to Title 42 U.S.C. §§ 1983 and 1988.  On July 25, 2011, the Defendants removed the case to the United States District Court For The Northern District of Florida,

Tallahassee Division, pursuant to Title 28 U.S.C. Sections 1441, 1443, 1446 and 1343, and N.D. Fla. Loc. R. 3.1(B) and 7.2.  Per the agreement of counsel for all parties, Plaintiff's Second Amended Complaint is hereby filled.

2.     All conditions precedent to filing this lawsuit, including those required by §768.28, Fla. Stat., have been met or otherwise waived.

3.     The events giving rise to this lawsuit occurred in Tallahassee, Leon County, Florida, and all parties to this lawsuit are residents of, or otherwise headquartered in Leon County, Florida, and therefore, the Circuit Court of the Second Judicial Circuit In And For Leon County, Florida, as well as the United States District Court For The Northern District of Florida, Tallahassee Division are both appropriate in terms of jurisdiction and venue.

## II.  PARTIES

4.     Plaintiff, RICHARD KELLEY HARTE, was and remains, at all times relevant to this Amended Complaint, a citizen of the United States of America, and a permanent resident of Tallahassee, Leon County, Florida.

5.     At all times relevant to this Second Amended Complaint Defendant CITY OF TALLAHASSEE was a municipality organized and existing under the law of the State of Florida, and is a "person" for purposes of this lawsuit.

6.     At all times relevant to this lawsuit, the TALLAHASSEE POLICE DEPARTMENT, was and remains a "Department" of Defendant City of Tallahassee, with a stated mission to "provide public safety services equally to all and to protect all citizens" within its jurisdiction.

7.     Defendant, JEFF MAHONEY, at all times relevant to this lawsuit was and remains a sworn law enforcement officer employed by the City of Tallahassee, and assigned to the Tallahassee Police Department, serving in the position of Investigator.

8.     In this Second Amended Complaint Plaintiff RICHARD KELLEY HARTE is also referred to as "Plaintiff" or "Kelley Harte", while Defendant CITY OF TALLAHASSEE, is also referred to as "Defendant", "Tallahassee Police Department" or "TPD", and Defendant JEFF MAHONEY, an Investigator and sworn law enforcement officer employed by the City of Tallahassee, is also referred to as "Defendant," "Investigator Mahoney" or "Mahoney"; collectively, the City of Tallahassee and Investigator Mahoney are also referred to in this Second Amended Complaint as "Defendants".

9.     At all times relevant to this Second Amended Complaint, Defendant Jeff Mahoney, a sworn law enforcement officer employed by the City of Tallahassee and assigned to the Tallahassee Police Department as an Investigator, as well as the non-defendant sworn law enforcement officers and other personnel employed by the City of Tallahassee and assigned to the Tallahassee Police Department who were directly or indirectly involved in the events giving rise to this lawsuit, acted toward Plaintiff Kelley Harte under color of the statutes, ordinances, policies, procedures and customs of the State of Florida, City of Tallahassee, and the Tallahassee Police Department.

10.     To help ensure sworn law enforcement officers employed by the City of Tallahassee, including Defendant Jeff Mahoney, carry out their duties in a legal and competent manner, and use law enforcement practices appropriate under the circumstances, the Tallahassee Police Department at all times relevant to this lawsuit was responsible for the promulgation, implementation and monitoring of proper police policies, procedures and practices, sometimes

3

referred to as "Policies and Procedures", "Standard Operating Procedures", "SOP", "General Orders" or "Special Orders" (herein also collectively referred to as "SOP" and / or "Policies and Procedures"), with which sworn law enforcement officers employed by the City of Tallahassee Police Department are required to comply.

11.     At all times relevant to this lawsuit, pursuant to the Tallahassee Police Department's duty to promulgate, implement, and monitor its police Policies and Procedures to guide its sworn law enforcement officers in carrying out their law enforcement duties in a legal and competent manner, the Tallahassee Police Department, as a Department of Defendant City of Tallahassee, was responsible for ensuring its sworn law enforcement officers received adequate training and were knowledgeable regarding the Tallahassee Police Department's Policies and Procedures, and that the Tallahassee Police Department's sworn law enforcement officers were properly supervised and monitored to ensure they were complying with Tallahassee Police Department's Policies and Procedures.

### III.  STATEMENT OF FACTS

12.     Kelley Harte and his Wife, Barbara Jensen Harte were married in Dunedin, Florida on September 17, 1983, and initially established their marital home in Bradenton, Florida; later moving to Tampa, Florida, as Kelley Harte pursued a career with Xerox Corporation.

13.     After 13 ½ years of employment with Xerox Corporation, Kelley Harte was offered the opportunity to own and operate a Xerox agency serving the greater Tallahassee area, which the Harte family accepted, resulting in Kelley and Barbara Harte and their two children,

moving to Tallahassee in March of 1994; the couples' third child was born in Tallahassee approximately two years later.

14.     Upon relocating to Tallahassee in March, 1994, Kelley and Barbara Harte established Capital Business Systems, Inc., a family owned business that operated a Xerox agency in the greater Tallahassee area.

15.     Over time, and with considerable dedication and hard work, Capital Business Systems, Inc., became a successful business, adequately supporting the Harte family as well as the families of its employees.

16.     By November, 2006, Barbara Harte had not worked full-time in the Harte family business for a number of years, electing instead to remain at home, devoting her talents and efforts to caring for the Hartes' home and their three children, while also volunteering her time to assist with various charitable and community causes.

17.     On Saturday, November 18, 2006, two of the Harte children attended an FSU football game, while the third Harte child visited a friend; Kelley and Barbara Harte stayed home watching the FSU football game on television.

18.     Except for a period of approximately two (2) hours, sometime between 7:00 and 9:30 p.m., when Kelley Harte went to Walmart grocery shopping and briefly stopped by his office and ABC Liquors, the Hartes' spent the evening of Saturday, November 18, 2006, watching television and relaxing as they had done most of the day.

19.     As Kelley and Barbara Harte watched television in their master bedroom, two of their children who had returned from the FSU football game watched television in the T.V. room, until Kelley Harte checked on them at approximately 11:30 p.m. and found the youngest

child asleep on the couch, whereupon he sent him to bed (the Hartes' middle child was away spending the night at a friend's house).

20.  While watching television in the master bedroom during the late evening of Saturday, November 18, 2006, Barbara Harte prepared herself a relatively tall glass of ginger-ale and bourbon, as did Kelley Harte.

21.  Kelley and Barbara Harte watched television in their down-stairs master bedroom until about 2:00 a.m. when Barbara Harte dozed off to sleep, followed by Kelley Harte.

22.  On the evening of Saturday, November 18, 2006, on into the early morning hours of Sunday, November 19, 2006, Kelley Harte did not observe, nor did he suspect Barbara Harte was under the influence of cocaine or any other drug, nor did he suspect she was consuming an excessive amount of alcohol.

23.  Sometime after both Kelley and Barbara Harte had fallen asleep, Kelley Harte was awakened by Barbara Harte who asked him to rub her upper back and left shoulder which had bothered her since the early part of the week.

24.  While Kelley Harte was rubbing Barbara Harte's upper back and shoulder, Barbara Harte decided it may be helpful to soak in the Jacuzzi bathtub located in the adjacent master bathroom, prompting Kelley Harte to go into the master bathroom and begin running water into the Jacuzzi bathtub.

25.  Prior to getting into the Jacuzzi bathtub, Barbara Harte requested Kelley Harte to again rub her upper back and shoulder, which Kelley Harte did as Barbara Harte sat on the built-up area on the side of the Jacuzzi bathtub.

26.  When Kelley Harte finished with Barbara Harte's second upper back and left shoulder rub, Barbara Harte proceeded into the Jacuzzi bathtub, pausing to soak for a moment

6

before turning on the Jacuzzi bathtub jets, while Kelley Harte returned to the master bedroom and sat in a comfortable chair, turned on the television and eventually began to doze.

27.   Sometime later Kelley Harte woke-up and upon hearing the jets of the Jacuzzi bathtub still running, immediately went into the bathroom where he saw Barbara Harte lying in the Jacuzzi bathtub, with her head to the side and most of her face below the water.

28.   Kelley Harte immediately turned off the Jacuzzi bathtub jets, stepped into the Jacuzzi bathtub, grabbed Barbara underneath her arms and pulled her from the Jacuzzi bathtub, placing her on the bathroom floor.

29.   Observing Barbara Harte was unconscious and in no way responsive, Kelley Harte quickly turned her on her side and observed a quantity of water exit through her mouth, whereupon he yelled out for the Hartes' 19-year old daughter, Alison Harte, to assist him as he began performing CPR, during which time additional water came out of Barbara Harte's mouth between Kelley Harte's breaths.

30.   Within a short moment, Alison Harte arrived downstairs and immediately called 911 for assistance as instructed by Kelley Harte.

31.   Alison Harte informed the 911 operator of the emergency situation and responded to the 911 operator's inquiries, including taking over performing CPR as the responder to whom the operator connected the call provided CPR coaching.

32.   Less than ten minutes after the 911 call was placed, two uniformed police officers from the Tallahassee Police Department arrived at the Harte residence, and after being let in by the Hartes' eight year old son, were met by Kelley Harte who showed them to the master bathroom, where TPD Officer Brannon observed Alison Harte performing CPR, and after

assessing Barbara Harte's condition took over performing Barbara Harte's first-aid with the help of the second TPD Officer.

33.   TPD Officer Brannon, the first of two TPD Officers to initially arrive at the Harte residence, and the first TPD officer to assess Barbara Harte's condition, reported the following regarding Barbara Harte:

      A.  Showed no signs of lividity, rigor or obvious signs of trauma;

      B.  Body still somewhat warm to the touch;

      C.  Unconscious;

      D.  Face slightly blue; and,

      E.  Could not detect a heart beat or breathing sounds.

34.   Moments after TPD Officer Brannon began providing Barbara Harte first-aid, Leon County EMS paramedics arrived and took over those duties permitting TPD Officer Brannon an opportunity to inspect relevant areas of the Harte residence, whereupon he reported the following:

      A.  Did not observe any obvious signs of struggle in the bathroom or the bedroom;

      B.  The water in the bathtub was luke warm when TPD Officer Brannon unsuccessfully attempted to engage the drain plug breaking the handle in the process.

35.   Leon County EMS paramedics removed a considerable amount of water (10-20 cc) from Barbara Harte's lungs, requiring "hard suction" before she could be intubated, however, as with TPD Officer Brannon's observations, the Leon County EMS paramedics both upon arrival at the Harte residence and enroute to the Emergency Department at Tallahassee Memorial

Hospital, observed no signs of trauma to Barbara Harte's body as reflected in the following excerpts from the Leon County EMS Run Report:

    A.  Patient was found to be unconscious, not breathing and without a heart beat;

    B.  Patient's head and face were clear with no trauma noticed; chest was clear with no trauma noticed; abdomen was soft with no trauma noticed; and, lower legs were also clear with no trauma noticed.

36.  At 6:16 a.m. the Leon County EMS departed the Harte residence, taking Barbara Harte to the Emergency Department of Tallahassee Memorial Hospital by emergency transport.

37.  Uniformed TPD Officer S. Harriett followed the ambulance to the Emergency Department at Tallahassee Memorial Hospital and remained with Emergency Department medical personnel treating Barbara Harte until Barbara Harte was pronounced dead at 6:40 a.m., at which time Officer Harriett maintained custody of Barbara Harte's body at the Emergency Department until being relieved by another uniformed TPD Officer sometime around 7:00 a.m.

38.  Despite having seen no obvious signs of struggle in the master bedroom or master bathroom, and despite having observed no obvious signs of trauma on Barbara Harte's body, which was consistent with the Leon County EMS paramedics' informed observations, the TPD Dispatch Log book reflects that by 6:04 a.m., the City of Tallahassee Police Department classified the Harte residence as a "crime scene".

39.  As the Leon County EMS began to leave the Harte residence pursuant to their emergency transport of Barbara Harte to the Tallahassee Memorial Hospital Emergency Department, Kelley Harte's request to ride in the ambulance with his wife was harshly denied by TPD Officers who stated "you are not going anywhere."

40.  Despite observing no signs of struggle in the Harte's master bedroom and master bathroom, and despite no obvious signs of trauma observed by the TPD Officers initially

assessing Barbara Harte's condition, and despite paramedics who provided Barbara Harte's first-aid having observed no signs of trauma on Barbara Harte's head, face, chest, abdomen and legs, and despite the presence of the Hartes' 19-year old daughter, Alison Harte, an adult who also lived at the Harte residence and was available to provide TPD Officers with access to relevant areas of the Harte house, TPD Officers ordered Kelley Harte not to leave his house, and to remain under the direct observation of TPD Investigators or uniformed Officers until directed otherwise.

41.   According to the TPD Dispatch log, no less than eighteen (18) TPD Officers, Investigators, Crime Scene Technicians and other TPD personnel were at the Harte residence at various times between 6:00 a.m. and approximately 2:45 p.m., on Sunday, November 19, 2006, while Kelley Harte was ordered to remain in his house as one TPD Officer after another rotated shifts observing Kelley Harte when he was not otherwise being interviewed by TPD Investigators.

42.   As City of Tallahassee Police Department Officers did not permit Kelley Harte to go to the Emergency Department of Tallahassee Memorial Hospital, or for that matter to leave his residence on the morning of November 19, 2006, Kelley Harte was not aware of his Wife's passing until being so informed by TPD Personnel at approximately 8:00 a.m., shortly after which TPD Personnel began efforts (without informing Kelley Harte) to convince a Medical Examiner to come to the hospital that same Sunday morning and perform a full autopsy of Barbara Harte's body.

43.   At approximately 8:15 a.m., less than two hours after EMS paramedics had departed the Harte residence and rushed Barbara Harte to the Emergency Department, TPD Investigator Mahoney, TPD Sergeant J. Johnson and TPD Investigator A. Garrett presented Kelley Harte with

two Tallahassee Police Department forms 1) requesting Kelley Harte to waive his constitutional rights and permit "Investigator Mahoney and Tallahassee Police Officers" to search his residence and "to take . . . any letters, papers, materials or other property which they may desire," and 2) requesting Kelley Harte to waive his constitutional right to remain silent and "talk to us" [meaning Investigator Mahoney, Investigator Garrett and Sergeant Johnson].

44.   Upon being handed the TPD forms Kelley Harte requested permission to go into his master bedroom suite to look for his reading glasses, prompting Investigator Mahoney to escort Kelley Harte into his master bedroom, master bathroom and the entrance to his walk-in closet where Kelley Harte located his glasses on top of a built-in dresser, following which Investigator Mahoney promptly escorted Kelley Harte back to his living room to re-join Investigator Garrett and Sergeant Johnson.

45.   Kelley Harte informed Investigators Mahoney and Garrett and Sergeant Johnson he preferred to consult with an attorney before signing the TPD forms, however, he did not have an attorney and would attempt to contacting one or more of the attorneys he knew as customers of his office equipment business for advice or for a referral.

46.   After Kelley Harte unsuccessfully attempted to contact an attorney early Sunday morning for approximately 30 minutes, the TPD Officers informed Kelley Harte they desired to proceed with the search of his home and if necessary, they would seek a search warrant.

47.   Kelley Harte informed Investigators Mahoney and Garrett and Sergeant Johnson a search warrant would not be necessary and signed the two TPD Forms authorizing the City of Tallahassee Police Department to search his residence and to "talk" with him.

## IV.  TPD INVESTIGATION AND INVESTIGATIVE REPORT

48.  Investigators Mahoney and Garrett began their interview of Kelley Harte Sunday morning at 9:03 a.m., which lasted less than one (1) hour wherein Kelley Harte related to the TPD Investigators the events of Saturday evening and the early morning hours of Sunday morning, November 18 – 19, 2006, as set forth above in paragraphs 18 - 32.

49.  TPD forensic technicians and uniformed police officers began photographing and searching the Harte residence sometime before Kelley Harte signed the TPD form consenting to the search of his house and removal of its contents, and at 2:45 p.m., completed their search, including the seizure of some 64 items from the Harte residence (including bags of clothing and laundry), at which time Kelley Harte was authorized to again move about his residence and to come and go as he desired.

50.  By  shortly before 10:30 a.m., Sunday morning, November 19, 2006, (less than four (4) hours after Barbara Harte had been pronounced dead), Chief Medical Examiner, David T. Stewart, M.D., arrived at Tallahassee Memorial Hospital as requested by Investigator Mahoney, and after briefly meeting with TPD personnel, began performing a full autopsy of Barbara Harte's body.

51.  On January 19, 2007, Chief Medical Examiner, David T. Stewart, M.D., received the toxicology report relating to the blood, bile and Vitreous humor taken from Barbara Harte's body during the November 19, 2006, autopsy (prepared by Bruce A. Goldberger, Ph.D., Director of Toxicology at the University of Florida Medical School), and on February 23, 2007, the Chief Medical Examiner completed the report of his November 19, 2006, autopsy of Barbara Harte's body, a copy of which was obtained by the City of Tallahassee Police Department just before 3:00 p.m., on the afternoon of Friday, March 2, 2007.

52.   The criminal investigation into Barbara Harte's death, of which Kelley Harte was the target since the early morning of November 19, 2006 when EMS paramedics first departed the Harte residence transporting Barbara Harte to the Tallahassee Memorial Hospital Emergency Department, was actively worked for approximately two (2) months before becoming far less inactive during the latter part of January 2007, and concluding with a "Supervisor's Approval" on March 14, 2007.

## V.  INVESTIGATOR MAHONEY'S / CITY OF TALLAHASSEE POLICE DEPARTMENT'S "ARREST / PROBABLE CAUSE AFFIDAVIT"

53.   A nine page "Arrest / Probable Cause Affidavit," sworn and subscribed to by Investigator Mahoney on March 6, 2007, was presented the same day to the Honorable Thomas H. Bateman, III, Circuit Judge for the Second Judicial Circuit, seeking the arrest of Richard Kelley Harte for the alleged premeditated murder of his wife, Barbara Jensen Harte.

See Exhibit (1) - Copy of "Arrest / Probable Cause Affidavit," sworn and subscribed to by Investigator Mahoney on March 6, 2007, attached and incorporated by reference.

54.   At the end of the attestation / authorization page of Investigator Mahoney's March 6, 2007, "Arrest / Probable Cause Affidavit" (page 9 of 9), is a line beginning with the words "Warrant approved by ASA" followed by the hand-printed name "Robin Lotane," with the date and the means of communication ("Email / telephone / in person") left blank, failing to indicate Chief Assistant State Attorney Robin Lotane had approved the said "Arrest / Probable Cause Affidavit, as follows:

Warrant approved by ASA   ROBIN  LOTANE    on              via Email / telephone / in person.

55.   Neither the TPD Investigative Report relating to the investigation of Barbara Harte's death, nor the State Attorney's file relating to Kelley Harte's prosecution for allegedly murdering his wife, Barbara Harte, as provided to Kelley Harte's representative and by the respective

agencies, reflect any communications between TPD Investigator Mahoney (or other TPD representative) and Chief Assistant State Attorney Robin Lotane (or any other representative of the State Attorney's Office) regarding the approval of the "Arrest / Probable Cause Affidavit," sworn and subscribed to by Investigator Mahoney on March 6, 2007, as presented to the Honorable Thomas H. Bateman, III, Circuit Judge.

56.   Pursuant to the March 7, 2007, Arrest Warrant issued by the Honorable Thomas H. Bateman, III, which he approved based on the "Arrest / Probable Cause Affidavit," sworn and subscribed to by Investigator Mahoney on March 6, 2007, Kelley Harte was arrested at his residence by uniformed TPD Officers on March 7, 2007, and taken to the Leon County Jail where he was confined without bail.

57.   In preparing the "Arrest / Probable Cause Affidavit" seeking a warrant for the arrest of Kelley Harte on charges of having murdered his wife, Barbara Harte (to which Investigator Mahoney swore and subscribed as to its truthfulness and accuracy on March 6, 2007), Investigator Mahoney allegedly relied on the investigative report regarding the TPD investigation into the facts and circumstances of Barbara Harte's death conducted by Investigator Mahoney and other TPD personnel.

58.   The "Arrest / Probable Cause Affidavit" to which Investigator Mahoney swore and subscribed on March 6, 2007, seeking a warrant for the arrest of Kelley Harte on a charge of having murdered his wife, Barbara Harte, and presented to the Honorable Thomas H. Bateman, III, Circuit Judge, contained material misrepresentations and omitted material facts obtained by Investigator Mahoney and other TPD personnel during their investigation into the facts and circumstances relating to Barbara Harte's death, as documented in TPD's Investigative Report.

14

59.   Had the "Arrest / Probable Cause Affidavit," to which Defendant Mahoney swore and subscribed on March 6, 2007, seeking a warrant for the arrest of Kelley Harte on a charge of having murdered his wife, Barbara Harte, not misrepresented and omitted material facts obtained during TPD's investigation into Barbara Harte's death, and instead reflected an honest account of the material findings forth in TPD's Investigative Report, the March 7, 2007, warrant for Kelley Harte's arrest would not have been issued as Investigator Mahoney's March 6, 2007, "Arrest / Probable Cause Affidavit," could not have truthfully set forth an adequate factual basis for finding probable cause to believe Kelley Harte murdered his wife, Barbara Harte.

### Misrepresentations In The March 6, 2007, "Arrest / Probable Cause Affidavit" Resulting From Misleading And False Factual Assertions

**Affidavit's Affirmative Misrepresentations Regarding Chief Medical Examiner's Reported Findings Relating to the Autopsy of Barbara Harte's Body:**

60.   At 2:49 p.m. on Friday March 2, 2007, the TPD Forensic Unit obtained a facsimile copy of Dr. Stewart's February 23, 2007, "Autopsy Report" reflecting the Chief Medical Examiner's findings relating to his November 19, 2006, autopsy of Barbara Harte's body, which included the "Forensic Toxicology Laboratory Report" prepared on January 19, 2007, by Bruce A. Goldberger, Ph.D., Director of Toxicology and Professor in the "Department of Pathology and Laboratory Medicine" at the University of Florida Medical School.

61.   Other than Investigator Mahoney and the other three members of the of the Tallahassee Police Department attending Dr. Stewart's autopsy of Barbara Harte's body on the morning of Sunday, November 19, 2006, and receipt of the facsimile copy of Dr. Stewart's February 23, 2007, Autopsy Report on the afternoon of Friday, March 2, 2007, which included a copy of Dr. Goldberger's January 19, 2007, "Forensic Toxicology Laboratory Report, the TPD Investigative Report relating to TPD's investigation into Barbara Harte's death, and Dr.

15

Stewart's autopsy file relating to his autopsy of Barbara Harte's body, reflect no contact between TPD personnel and Dr. Stewart (or anyone else from the Medical Examiner's Office), prior to March 7, 2007 (or for that matter any other time), to ensure an accurate understanding of Dr. Stewart's findings and opinions relating to the cause and manner of Barbara Harte's death; including no follow-up discussions regarding the significance of Dr. Goldberger's "Forensic Toxicology Laboratory Report" reflecting high alcohol levels (Ethanol – Blood .23 g/dl, Ethanol - Bile .24 g/dl and Ethanol – Vitreous Humor .26 g/dl)  and very high cocaine levels (Cocaine 785 ng/ml, Benzoylecgonine 2,475 ng/ml, Cocaethylene 454 ng/ml), as it relates to the cause of Barbara Harte's death.

62.   Investigator Mahoney's "Arrest / Probable Cause Affidavit" of March 6, 2007, does not state (nor should it) the autopsy of Barbara Harte's body performed by Chief Medical Examiner David T. Stewart, M.D., on November 19, 2006, as reflected in Dr. Stewart's Autopsy Report of February 23, 2007, was improperly performed or inaccurately reported, and accordingly, to the extent the statement in Investigator Mahoney's March 6, 2006, " Arrest / Probable Cause Affidavit" regarding ". . .  the physical evidence on her [Barbara Harte's] body," refers to bruises, evidence of medical treatment, etc., such references must be considered in light of Dr. Stewart's findings as reflected in his February 23, 2007, "Autopsy Report" (including the "Forensic Toxicology Laboratory Report" dated January 19, 2007, attached to Dr. Stewart's Autopsy Report), which Dr. Stewart performed for the specific purpose of determining the cause and manner of Barbara Harte's death, as required by Florida Statutes.

63.   Investigator Mahoney's "Arrest / Probable Cause Affidavit" of March 6, 2007, seeking a warrant for the arrest of Kelley Harte on charges of having murdered his wife, Barbara

Harte, contains the following material statements initially intended to mislead, and ultimately intended to misrepresent, Dr. Stewart's reported autopsy findings:

    A.  Referring to the contents of Dr. Stewart's February 23, 2007, Autopsy Report, Investigator Mahoney's "Arrest / Probable Cause Affidavit" initially states the following on in the second full paragraph of page 1 of 9;

> Dr. Stewart performed an autopsy and the findings revealed that the cause of death was determined to be drowning. . . . The victim's body had evidence of recent and past bruising. Dr. Stewart advised that fresh hemorrhage / bruising was located on victim's . . . right outer hand, right forearm which also contained an abrasion. The bruising is indicative of the victim having been involved in a struggle.

    B.  Again referring to Dr. Stewart's reported autopsy findings, Investigator Mahoney's March 6, 2007, Arrest / Probable Cause Affidavit" ultimately states the following on page 8 of 9;

> The medical examiner advised the bruising on the victim was consistent with her having been in a recent struggle . . . ."

    64.  Contrary to Investigator Mahoney's misleading references and misrepresentations on pages 1 of 9 and 8 of 9 of his March 6, 2007, "Arrest / Probable Cause Affidavit," the Autopsy Report completed and signed by Chief Medical Examiner David T. Stewart, M.D., on February 23, 2007, setting forth his findings relating to the autopsy he performed of Barbara Harte's body on November 19, 2006, in NO way states or otherwise references the bruises / contusions he observed on Barbara Harte's body being consistent with, or indicative of, Barbara Harte having been in involved in a struggle with Kelley Harte nor anyone else.

    65.  The TPD Incident Reports prepared by Investigator Mahoney and Forensic Supervisor JoAnne Maltese after observing Dr. Stewart perform the autopsy of Barbara Harte's body on the morning of Sunday, November 19, 2006, in NO way reflect that during or after his autopsy of Barbara Harte's body, Dr. Stewart stated or otherwise referenced, either verbally or in

writing, the bruises / contusions he observed on Barbara Harte's body being consistent with, or indicative of, Barbara Harte having been in involved in a struggle of any kind.

66.   In describing various bruises observed on Barbara Harte's upper extremities as set forth in Dr. Stewart's February 23, 2006, Autopsy Report, Investigator Mahoney's March 6, 2006, "Arrest / Probable Cause Affidavit" misrepresents as "evidence of injury" fresh hemorrhage / bruising located on the victim's "outer right hand" when in fact:

> The "EVIDENCE OF TREATMENT" section of Dr. Stewart's autopsy report states "[t]here is a needle puncture wound in the right dorsal hand," clearly identifying the condition of the dorsal area of the right hand is associated with the medical treatment Barbara Harte received from EMS paramedics and / or Emergency Department.

67.   David T. Stewart, M.D., performed the autopsy of Barbara Harte's body on November 19, 2006, pursuant to his appointment as the Chief Medical Examiner for District Two (Franklin, Gadsden, Jefferson, Leon, Liberty, Taylor and Wakulla Counties) in accordance with his statutory duty ". . . to determine the cause and manner of death in those cases in which . . . a person's death involves any . . . unusual circumstance," and reported his findings relating to his autopsy of Barbara Harte's body in the "Autopsy Report" he completed and signed on February 23, 2007, which contrary to Investigator Mahoney's sworn statements in his "Arrest / Probable Cause Affidavit," contains absolutely NO statements, opinions or references to force, physical struggle or foul play in connection with Barbara Harte's November 19, 2006, drowning.

**Affidavit's Affirmative Misrepresentations Regarding the Statement of a "Material" Witness:**

68.   In an attempt to add support and greater significance to his material misrepresentations relating to Dr. Stewart's reported autopsy findings as identified above in paragraph 64, Investigator Mahoney's "Arrest / Probable Cause Affidavit" sets forth on page 7

of 9, the following material misrepresentation relating to a recorded statement provided by a witness identified as Strauss:

> On Saturday 11/18/06 at approximately 4:00 am he [Strauss] was at the Harte's house.  Strauss said the three of them were drinking, using cocaine and having sex. Strauss said he observed the victim naked and he only saw one bruise near the victim's buttocks. Strauss said he did not observe any additional bruising on the victim's body.

69.  As reflected in the transcript of Strauss' December 2, 2006, recorded statement obtained by Investigator Mahoney and another TPD investigator, Strauss did NOT claim or otherwise state he observed Barbara Harte naked on the morning of Saturday, November 18, 2006, nor did he state he "saw one bruise near the victim's buttocks". .

70.  The following excerpts from the transcript of Strauss' recorded interview of December 2, 2006, reveal that not only did Strauss NOT claim to have seen Barbara Harte naked on the morning of November 18, 2006, but also demonstrate Investigator Mahoney's very general and misleading statement that "Strauss said the three of them were drinking, using cocaine and having sex," as set forth on page 7 of 9 of Investigator Mahoney's March 6, 2007 Sworn "Arrest / Probable Cause Affidavit," is based on very uncertain and contradictory testimony, in that Strauss initially denied he had "sex" with Barbara Harte on the morning of Saturday, November 18, 2006, and only after being prompted with dates and time, and given a moment to reconsider, did Strauss state "I take that back, I had oral sex with her":

(Page 31 of Strauss' interview transcript.)

MAHONEY: Did you have sex  with her on Saturday?

STRAUSS: No.

MAHONEY: Okay. Did she have sex  with anybody on Saturday that you saw?

STRAUSS: No I was the only one there.

(Page 32 of Strauss' interview transcript.)

MAHONEY: Okay.

STRAUSS: Let me take it back.

GARRETT: Between 4 a.m. and 7 a.m.

STRAUSS: I had Saturday morning when I was there?

GARRETT: Yeah when you got there late Friday night.

STRAUSS: I take that back I had oral sex with her.

MAHONEY: Okay, and where was he at?

STRAUS : No telling. (INAUDIBLE)

71.   Recovering from his alleged mental lapse, after first being improperly and inaccurately prompted by the TPD Officers stating "[b]etween 4:00 a.m. and 7:00 a.m. . . .Yeah when you got there late Friday night," Strauss' statement "I take that back I had oral sex with her" (a statement for which neither TPD Investigator sought more specific information or clarification), in no way provided Investigator Mahoney with a basis for swearing under oath in his "Arrest / Probable Cause Affidavit" that "On Saturday 11/18/06 . . . Strauss said he observed the victim naked and he saw one bruise near the victim's buttocks."

72.   Based on the fact Barbara Harte was experiencing her menstrual cycle on November 19, 2006 (as reported by Dr. Stewart and corroborated by the large open container Tampons™ photographed in Barbara Harte's area of the master bedroom on the morning of November 19, 2006 by TPD forensic technicians), it is very doubtful Strauss' alleged "oral sex" would have involved Barbara Harte exposing herself.

73.   Regarding Strauss' alleged visit to the Harte residence between 4:00 a.m. and 7:30 a.m., Saturday, November 18, 2006, Investigator Mahoney and the TPD Investigator assisting

him failed to interrogate Strauss regarding the lighting conditions, Barbara Harte's clothing (or lack thereof), the quantities of alcohol and / or cocaine Strauss consumed, the extent to which he believed his mental faculties may have been impaired, along with many other questions that would have helped to determine whether or not there was a reasonable basis to believe Strauss visited the Hartes' residence on the said morning and if so, the probability of Strauss having actually observed the matters he vaguely reported, and finally, his ability to accurately recall such facts almost three (3) weeks later in light of his drug and alcohol induced mental state at the time of the alleged event, (nor did Strauss volunteer such information), and accordingly there was NO reasonable factual basis for Investigator Mahoney to state under oath "Strauss said he observed the victim naked [on the morning of Saturday 11/18/06 between 4:00 a.m. and 7:30 a.m.] and he only saw one bruise near the victim's buttocks."

74. Relying on the above material misrepresentation relating to Strauss' recorded statement, Investigator Mahoney's "Arrest / Probable Cause Affidavit" misrepresents on page 8 of 9 that "Strauss' statement that he had not seen bruising on the victim the previous morning" corroborates Investigator Mahoney's previous misrepresentation that the Medical Examiner "advised that the bruising on the victim was consistent with her having been in a recent struggle."

### Misrepresentations In The March 6, 2007, "Arrest / Probable Cause Affidavit" Resulting From Omissions of Known Material Facts

**Omissions of Material Facts Explaining Probable Source of Older And More Recent Bruises on Barbara Harte's Body:**

76. Despite the considerable (as well as incredible) reliance Investigator Mahoney's sworn "Arrest / Probable Cause Affidavit" of March 6, 2007, places on the December 2, 2006, recorded interview of Strauss, Investigator Mahoney's March 6, 2006, "Arrest / Probable Cause

Affidavit" makes absolutely NO mention of the following relevant and material statements made

by Strauss during the said December 2, 2006 interview:

> (Page 16 of Strauss' interview transcript.)
>
> [S]he [Barbara Harte] would fall all over the place that's sort of why a lot of people didn't party with them cause Barbie was so annoying. She would fall a lot so a lot of the bruises and stuff she was bruised I could see that.
>
> (Page 23 of Strauss' interview transcript.)
>
> New Year's Eve they came to the house and she was bleeding like a stith [sic] from her head, it was a little scratch it was a little tiny thing. She had bumped her head at Bannerman's and I know that to be true cause a few people at Bannerman's were talking about it.

77.     As reflected in the following excerpt from TPD Investigator Garrett's December

8, 2006 interview with a witness identified as J. Holland, a woman with whom Barbara Harte

had socialized, other witnesses in addition to Strauss observed Barbara Harte's propensity for

falling, especially when she had been drinking, and as with Strauss' statements in this regard,

Investigator Mahoney completely ignored these facts in preparing his March 6, 2006 "Arrest /

Probable Cause Affidavit":

> Ms. Holland said the victim was very clumsy; she fell a lot.  While at Ms. Holland's Christmas party Barbee fell against a wine rack. . . .  Barbee was "super clumsy when she was drunk and Barbee used to get hammered".  Ms. Holland said that she was in the ladies room at the Cafe Cabernet with Barbee one night, when Barbee fell over while rising from the toilet.  Barbee struck her head on the handicap rail.

78.     Investigator Mahoney, along with other TPD personnel involved in the

investigation of Barbara Harte's death, prepared reports relating to recorded interviews of the

Harte's 19 and 16 year old daughters, both of whom had lived their entire lives with their

parents, Barbara and Kelley Harte, and both of whom stated their mother, Barbara Harte was

frail, under weight (105 pounds at the time of her death despite her height of 5' 7") and bruised

very easily, however, Defendant Mahoney's "Arrest / Probable Cause Affidavit" of March 6, 2007, makes no reference to these very credible and materially relevant observations by Barbara Harte's own daughters.

79.    Of the three bruises observed by the Chief Medical Examiner in fairly close proximity on the back of Barbara Harte's head, one bruise is clearly associated with the plastic hair clip Barbara Harte was wearing to keep her hair out of the water (as identified in the Chief Medical Examiner's "Autopsy Report"), as there are superficial scratches over the bruise that line-up with the hair clip's large "comb-like" teeth.

80.    On November 20, 2006, TPD Investigators recorded the second long interview of Kelley Harte, this time at TPD Headquarters, wherein Kelley Harte was asked the following relating to whether or not Barbara Harte was using some form of bath pillow or pad upon which to rest her head when she took her Jacuzzi bath:

(Page 16 of K. Harte's interview transcript.)

GARRETT: Did she have anything under her head while she was laying there? [Referring to when Barbara Harte began her Jacuzzi bath.)

HARTE: . . . [N]o she didn't, but my daughter remembers her having a clip in her hair to pull her hair up.  I didn't remember that last night she remembered it cause I was trying to think what. . . .

But, she didn't have like one of those neck rests or anything?

HARTE: No.

81.    In addition to Investigator Mahoney having personally viewed the Jacuzzi bathtub in the Harte's master bathroom on the morning of Sunday, November 19, 2006, the report of TPD's investigation into Barbara Harte's death contains a number of photographs of the Hartes' master bathroom taken by TPD Forensic Specialists on the morning of November 19, 2006, many of which identify the peculiar ridge at either end of the Jacuzzi bathtub formed by an angle

running downward from the top landing of the Jacuzzi bathtub approximately four inches (4"), at an angle of approximately 45 degrees, where the angle changes to approximately 120 – 160 degrees and runs to the bottom of the bathtub, with the change in angle (from approximately 45 degrees to approximately 120 – 160 degrees) lining-up with the approximate location of the back of a medium-size woman's head when sitting in the Jacuzzi bathtub.

82.     Despite having personally viewed the Jacuzzi bathtub in the Harte's master bathroom on the morning of November 19, 2006, and despite many of the photographs of the master bathroom contained in the report of TPD's investigation into Barbara Harte's death revealing the Jacuzzi bathtub having the rather peculiar and somewhat dangerous angle at a location where a woman of medium height would place the back of her head while sitting in the Jacuzzi bathtub, Investigator Mahoney's sworn "Arrest / Probable Cause Affidavit" makes no mention of the Jacuzzi bathtub's dangerous angle lining-up with the back of her head, nor the fact Barbara Harte was not using any form or bath pillow or neck rest while in the Jacuzzi bathtub during the early morning hours of November 19, 2006.

**Omission of Material Witness' Account of Having Previously Found Barbara Harte In Her Jacuzzi Bathtub Heavily Sedated With Her Head Below The Surface of the Water:**

83.     Again, despite the considerable reliance Investigator Mahoney's sworn "Arrest / Probable Cause Affidavit" of March 6, 2007, allegedly places on the December 2, 2006, interview of Strauss, incredibly Investigator Mahoney's March 6, 2006, "Arrest / Probable Cause Affidavit" makes absolutely NO mention or reference to the following highly relevant and material statement by Strauss, as reflected in the transcript of his recorded December 2 2006, interview, wherein Strauss related that within three (3) months of Barbara Harte's death he found her in the master bathroom Jacuzzi bathtub face down, under water, in a highly intoxicated state ("out of it"), causing Strauss to initially think she was dead:

24

(Page 4 of Strauss' interview transcript.)

STRAUSS: . . . Umm, and another thing if, I did find her in the hot tub with her head submerged about 3 months ago and umm I don't know where the hell Kelly was.

GARRETT: In the bed?  In their bathroom?

STRAUSS: I walked in and that was when she was really drinking heavily and coking heavily and not sleeping at all.  Umm, that wasn't her, her, that wasn't how she was Saturday she was vibrant she was alert.

(Page 16 of Strauss' interview transcript.)

GARRETT: You said you saw her underwater in the tub several months ago. What were the circumstances and how did that turn out?

(Page 17 of Strauss' interview transcript.)

STRAUSS: I was umm, invited over I came through the side door the jets were spraying out of the tub (INAUDIBLE) was drenched and she was face down underwater.

GARRETT: Hmm.

STRAUSS: I said Kelly Kelley.

GARRETT: She wasn't unconscious or asleep or anything she was just.

STRAUSS: No I don't know she wasn't I don't know she was out of it though. I thought she was gone I thought she was dead and I felt terrible because (INAUDIBLE).

**Omission of Material Evidence Relating To Barbara Harte's Undisclosed And Heavy Use of Cocaine And Alcohol:**

84.    In as much as neither the Investigative Report relating to TPD's investigation into

Barbara Harte's death nor the Chief Medical Examiner's file reflect the Chief Medical Examiner

(or anyone from his office), and TPD Investigators / Officers discussed the Chief Medical

Examiner's Autopsy Report setting forth his findings regarding the manner and cause of Barbara

Harte's death (or lack thereof), including the significance of the toxicological findings by Dr.

Goldberger as they relate to the manner and cause of Barbara Harte's death, Investigator Mahoney's sworn "Arrest / Probable Cause Affidavit" omits the material significance of the excessive amount ethanol and cocaine found in Barbara Harte's Blood (to say nothing of a significant amount of Cocaethylene, a metabolite formed as a result of the body metabolizing a dangerous mixture of cocaine and ethanol), and instead limits his consideration of this material information to misrepresenting alleged contradictions in Kelley Harte's account of the relevant facts leading up to Barbara Harte' death, as set forth in the following excerpt from page 8 of Investigator Mahoney's March 6, 2007, "Arrest / Probable Cause Affidavit":

> The victim's blood revealed that she had almost three times the legal limit of alcohol in her blood stream at the time of her death. . . [and] also showed a high level of cocaine. . . . [which] contradicts Mr. Harte's statement that the victim had only one drink. . . . [and] Mr. Harte's statement that the victim had used cocaine in the past.

85.     As reflected in the following excerpt from the TPD Investigative Report into Barbara Harte's death, TPD Investigator Garrett interviewed a witness identified as Jennifer Holland on December 8, 2006, who informed TPD Investigator Garrett of the following regarding Barbara Harte's undisclosed cocaine use and her attempts to locate a cocaine supplier without Kelley Harte's knowledge:

> During their last conversation, Barbee was asking for the name of a cocaine supplier. Barbee asked Ms. Holland not to tell Kelley that she was trying to buy cocaine.

86.     Returning again to the considerable (as well as incredible) reliance Investigator Mahoney's sworn "Arrest / Probable Cause Affidavit" of March 6, 2007 allegedly places on the December 2, 2006 interview of Strauss, it is remarkable Investigator Mahoney excluded from his March 6, 2007, sworn "Arrest / Probable Cause Affidavit" consideration the following statements of Strauss directly contradicting Investigator Mahoney's assertions that Barbara

Harte's high blood alcohol and cocaine levels contradict Kelley Harte's "statement that the victim had only one drink. . . . [and] used cocaine in the past."

> (Page 7 of Strauss' interview transcript.)

> STRAUSS: . . . So, there was a lot there that Kelly didn't know about. She [Barbara Harte] was using more [cocaine] than Kelly knew and I know she was drinking more than Kelly knew because she [Harte's daughter Alex Harte] kept finding empty bottles hidden around the house.

> (Page 7 of Strauss' interview transcript.)

> STRAUSS: Yeah, Kelly was concerned that Barbie was maybe seeing Derek behind his back.

> GARRETT: Why did he think that?

> STRAUSS: Cause he asked me if I got her that coke and I said absolutely not.

> GARRETT: And Derek was the one that was supplying the coke?

> (Page 12 of Strauss' interview transcript.)

> STRAUSS: He was, yeah he was the one, but you know, Kelly is brilliant.

## VI.  STATE ATTORNEY'S *NOLLE PROSEQUI* (DISMISSAL OF CHARGES) AND KELLEY HARTE'S RELEASE FROM JAIL

87.    Pursuant to the arrest warrant obtained by Investigator Mahoney on March 7, 2007, TPD Officers arrested Kelley Harte the same day on a charge of First Degree Murder for the alleged murder of his wife, Barbara Harte and held him without bond in the Leon County Jail from March 7, 2007, until April 21, 2007; a period of more than six (6) weeks.

88.    Except for obtaining statements on March 9 and 12, 2007 from witnesses whom TPD Officers / Investigators had already interviewed and made reports, neither TPD nor the State Attorney's office obtained additional evidence of a material nature not already in their

possession relating to Kelley Harte's pending criminal prosecution for the murder of his wife, Barbara Harte.

89.     On the evening of April 20, 2006, pursuant to his request earlier the same afternoon, William N. Meggs, State Attorney for Second Judicial Circuit of Florida, personally met with the Harte family (Alison Harte – daughter, Alexandria Harte – daughter, Jody Jensen – Aunt) and Kelley Harte's attorney, at the Harte family's residence and related to them the following:

A.  Responding to certain concerns brought to his attention by members of his staff, State Attorney Meggs sought a briefing regarding Kelley Harte's pending murder case from the Assistant State Attorney handling the matter;

B.  Not satisfied with the briefing he received from the Assistant State Attorney handling Kelley Harte's prosecution, State Attorney Meggs provided Kelley Harte's prosecution file to his former Chief Assistant State Attorney of many years (who had since retired), for review;

C.  After being notified of his former Chief Assistant State Attorney's concerns regarding Kelley Harte's arrest, confinement and pending prosecution, State Attorney Meggs met with the Chief Medical Examiner, Dr. Stewart, to discuss the results of the autopsy performed of Barbara Harte's body in the context of Kelley Harte's arrest and related murder charge as asserted in the "Arrest / Probable Cause Affidavit" dated March 6, 2007;

D.  Upon Dr. Stewart informing State Attorney Meggs his findings relating to the autopsy of Barbara Harte's body, as reflected in his Autopsy Report of February 23, 2007, did not support certain of the material allegations attributed to the Medical Examiner in the TPD "Arrest / Probable Cause Affidavit," and that the assertions in the said TPD "Arrest / Probable Cause Affidavit" regarding the manner in which Barbara Harte drowned were contrary to the Medical Examiner's position, State Attorney Meggs went immediately to the Tallahassee Police Department and met with TPD leadership, wherein he related the following:

●  State Attorney Meggs' review of the file relating to Kelley Harte's pending criminal case, the independent review of the said file obtained from his former Chief Assistant State Attorney, and his discussions with the Medical Examiner regarding the Medical Examiner's findings relating to the autopsy of Barbara Harte's body;

- State Attorney Meggs' extreme disappointment with the manner in which the investigation into Barbara Harte's death and the resulting arrest and confinement of Kelley Harte on charges of murder were handled;

- State Attorney Meggs' determination there was no valid legal basis for Kelley Harte's arrest, confinement and charge for murdering his wife, Barbara Harte, and accordingly, State Attorney Meggs was dismissing all charges against  Kelley Harte and having him promptly released from the Leon County Jail;

- State Attorney Meggs' decision to terminate the member of his staff responsible for the Kelley Harte's ongoing murder prosecution;

- State Attorney Meggs' strong encouragement that TPD leadership thoroughly review the TPD investigation into Barbara Harte's death in light of the "Arrest / Probable Cause Affidavit" dated March 6, 2007, and seriously consider disciplinary action regarding those members of the City of Tallahassee Police Department most responsible for bringing about Kelley Harte's arrest and confinement on a charge of murdering his wife, Barbara Harte; and,

- State Attorney Meggs' intention to promptly meet with the Harte family at their residence, and personally apologize for the improper investigation, arrest and confinement of Kelley Harte on charges of having murdered Barbara Harte.

E. In apologizing to the Harte family for the mental pain and anxiety they suffered as a result of Kelley Harte being arrested, confined and charged with Barbara Harte's murder, State Attorney Meggs stated proper procedures had not been followed in the investigation of Barbara Harte's death and related actions resulting in Kelley Harte's arrest, confinement and murder charge.

90.     On April 20, 2007, the Honorable William N. Meggs filed a *Nolle Prosequi* in the case of *State of Florida vs. Richard Kelley Harte*, thereby dismissing all charges against Kelley Harte and resulting in his prompt release from the Leon County Jail.

91.     Plaintiff Kelley Harte was released from the Leon County Jail on April 21, 2006, following more than six (6) weeks of confinement while facing highly publicized charges of having murdered his wife, Barbara Harte.

29

**VII.  NEWS MEDIA ACCOUNTS OF KELLEY HARTE'S ARREST AND
CONFINEMENT ON CHARGES OF HAVING MURDERED HIS WIFE,
CAUSING KELLEY HARTE TO EXPERIENCE EXTREME HUMILIATION,
RIDICULE, EMBARASSMENT AND ENORMOUS DAMAGE TO KELLEY HARTE'S
BUSINESS REPUTATION**

92.     Kelley Harte's arrest and confinement on a charge of having murdered of his

wife, Barbara Harte, received considerable media coverage, including an article that appeared in

the *Tallahassee Democrat* on the morning of Thursday, March 8, 2007, and a report by a WCTV

Eyewitness News reporter covering Kelley Harte's first court appearance from Leon County Jail

the same morning, summarized as follows:

A.  *Tallahassee Democrat*, Thursday, March 8, 2007 –

- On Wednesday, Richard Kelley Harte, 48, owner of Capital Business Systems, was arrested on charges of first-degree murder in the death of his wife.

- He was taken to the Leon County Jail and has his first court appearance this morning.

- An arrest report said Harte abused his wife for years before a struggle that led to her drowning in the bathtub at their home.

- "The bruising on the victim's arms are consistent with someone having held her down while in the bathtub, thus causing her to drown," states a court document.

- A close friend of the Hartes told police that the night before her death he and the Hartes were drinking, using cocaine and having sex, according to the court document.  He also said that the next night, Richard Harte invited him to bring another woman over and have sex. The friend declined.

B.  WCTV Eyewitness News, Thursday, March 8, 2007 –

- A Tallahassee man accused of drowning his wife made his first appearance in court.

- Richard Kelley Harte appeared via video link from the jail wearing a blue prison jump suit.

30

● Judge Judith Hawkins ordered him held without bond, and the entire hearing lasted only two minutes.

93.     In addition to causing Kelley Harte to suffer humiliation, ridicule and embarrassment, Kelley Harte's highly publicized arrest and period of confinement of more than six (6) weeks in the Leon County Jail, facing charges of having murdered his wife, Barbara Harte, destroyed and / or severely damaged business relationships Kelley Harte had established after many years of hard work.

94.     During Kelley Harte's period of confinement in the Leon County Jail for more than six (6) weeks he was unable to manage his wholly owned Xerox agency, and as a result the said business lost considerable revenue, causing Kelley Harte to suffer significant financial loss.

95.     Kelley Harte's highly publicized arrest and period of confinement of more than six (6) weeks in the Leon County Jail facing charges of having murdered his wife, Barbara Harte, caused significant and permanent damage to his reputation in the community as a business person, destroying and / or significantly damaging the business relationships he had established through many years of hard work managing the sales and operations of his small wholly owned Xerox agency, causing Kelley Harte to lose considerable income since the date of his highly publicized March 7, 2007, arrest, and will continue to cause Kelley Harte to suffer a considerable loss of income in the future.

96.     Because of the permanent damage to Kelley Harte's reputation in the community as a small business owner, caused by his highly publicized arrest and period of confinement of more than six (6) weeks in the Leon County Jail facing charges of having murdered his wife, Barbara Harte, the Xerox agency which Kelley Harte had founded, managed and developed into a successful small business, suffered a significant decline in revenues with Kelley Harte as the owner / operator, causing the value of the said Xerox agency to drop significantly.

97.     Because of the permanent damage to Kelley Harte's reputation in the community as a small business owner, caused by his highly publicized arrest and period of confinement of more than six (6) weeks in the Leon County Jail facing charges of having murdered his wife, Barbara Harte, the Xerox agency which Kelley Harte had founded, managed and developed into a successful small business suffered a significant decline in its ability to generate revenues with Kelley Harte as its owner / operator, forcing Kelley Harte to sell his Xerox agency at a significantly reduced price, and thereby causing Kelley Harte to suffer a considerable financial loss.

## VIII.  CLAIMS FOR DAMAGES

### COUNT I:
### UNLAWFUL SEIZURE, ARREST and FALSE IMPRISONMENT
### VIOLATION OF TITLE 42 U.S.C. § 1983
### (Defendant Jeff Mahoney, Individually)

98.     Plaintiff Kelley Harte realleges and incorporates paragraphs 1 through 97, above, as though fully set forth herein.

99.     In order to obtain a valid warrant for Kelley Harte's arrest on a charge of having murdered his wife, Barbara Harte, the Fourth Amendment to the United States Constitution required Defendant Mahoney to provide the Honorable Thomas H. Bateman, III, Circuit Judge, with a truthful factual showing in a sworn affidavit that there was probable cause to believe Kelley Harte murdered his wife, Barbara Harte.

100.    The Fourteenth Amendment to the United States Constitution prohibited Defendant Mahoney from intentionally, or with a reckless disregard for the truth, making materially false statements in his March 6, 2007, "Arrest / Probable Cause Affidavit" seeking a warrant for Kelley Harte's arrest for the murder of his wife, Barbara Harte, and also prohibited

32

Defendant Mahoney from omitting facts from his March 6, 2007, "Arrest / Probable Cause Affidavit" which he knew, or in the absence of a reckless disregard for the truth should have known, were materially relevant to Judge Bateman's determination of whether there was probable cause to believe Kelley Harte murdered his wife, Barbara Harte.

101.    Acting under the color of state law, Defendant Mahoney, a sworn law enforcement officer employed by the City of Tallahassee, violated and / or directly caused to be violated, Kelley Harte's civil rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution by improperly procuring a warrant for Kelley Harte's arrest on a charge of having murdered his wife, Barbara Harte, through a sworn "Arrest / Probable Cause Affidavit" dated March 6, 2007, which Defendant Mahoney knew, or in the absence of a reckless disregard for the truth should have known, contained materially false allegations implicating Plaintiff Kelley Harte in the murder of his wife, Barbara Harte, as set forth more fully in paragraphs 60 through 75 above, and either intentionally, or through a reckless disregard for the truth, omitted materially relevant facts demonstrating a lack of probable cause to arrest Kelley Harte for the murder of his wife, Barbara Harte, as set forth more fully in paragraphs 76 through 86 above.

102.    As a result of Defendant Mahoney's violations of Kelley Harte's civil rights guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution as set forth above, Plaintiff Kelley Harte was wrongfully seized, arrested and imprisoned on March 7, 2007, and for a period of more than six (6) weeks immediately following, thereby depriving Kelley Harte of his liberty without due process of law, and his right to equal protection under the law, more particularly described as follows:

A.  TPD Officers entered Plaintiff Kelley Harte's home on March 7, 2007, and found him taking a nap in his master bedroom, due to a reoccurring incapacitating migraine

33

headache;

B.  Upon observing Kelley Harte sleeping face down on his bed, TPD Officers, wearing "swat-type" protective gear jumped on top of Kelley Harte's back, forcing his arms behind him in order to lock Kelley Harte's hands / arms in handcuffs, causing serious injury, or seriously exacerbating a previous injury, to Kelley Harte's left shoulder which resulted in the immediate onset of severe pain;

C.  TPD Officers removed Kelley Harte from his home with his hands / arms locked in cuffs behind his back (using two sets of cuffs due the onset of severe pain in Kelley Harte's left shoulder), placed him into a marked TPD vehicle and transported him to a location approximately one (1) mile from his home where he was transferred to a larger prisoner transport vehicle, and taken to the Leon County Jail;

D.   Kelley Harte was booked into the Leon County Jail on March 7, 2007, on a charge of first degree murder for the alleged murder of his wife, Barbara Harte, whereupon Kelley Harte was stripped of his clothing, subjected to a full body cavity search, issued blue prison garb, had his fingerprints rolled and mug shots taken;

E.   March 8, 2007, the day following Kelley Harte's wrongful arrest, the Tallahassee Democrat Newspaper ran an article stating Kelley Harte, owner of Capital Business Systems was arrested on a charge of first degree murder, for the alleged murder of his wife, Barbara Harte.  The same day, television station WCTV ran a news television segment covering Kelley Harte's initial court appearance before the Honorable Judith Hawkins, reporting Kelley Harte, "accused of drowning his wife, Barbie in their bathtub . . . appeared via video link from the jail wearing a blue prison jump suit" and was "ordered to be held without bond. . . ."  WCTV also reported that TPD spokesperson Officer John Newland said "[t]he Medical Examiner said bruising around her [Barbara Harte's] arm which is consistent for somebody being held down underneath water in a tub";

F.  For a period of more than six (6) weeks following his March 7, 2007, arrest Kelley Harte remained confined in a small jail cell inside the Leon County Jail, which he shared with another inmate, absolutely void of privacy, and without adequate medical attention for the injury to his left shoulder; and,

G.  Upon Kelley Harte's release from the Leon County Jail more than six (6) weeks after his arrest, following the *Nolle Prosequi* filed by State Attorney Meggs dropping all charges, Kelley Harte sought medical treatment for his injured left shoulder, which revealed a significant injury, including torn tendons, some of which were fully retracted.

103.   At all times relevant to the allegations set forth in Count I of this Second Amended Complaint:

A.  Defendant Mahoney intended Kelley Harte to be seized, arrested and imprisoned in the Leon County Jail on a charge of having murdered his wife, Barbara Harte;

B.  Defendant Mahoney, through the fraudulent and / or reckless material misrepresentations and omissions in his "Arrest / Probable Cause Affidavit" dated March 6, 2007, caused Kelley Harte to be wrongfully seized, arrested, and imprisoned in the Leon County Jail on March 7, 2007, and for a period of more than six (6) weeks immediately following; and,

C.  Kelley Harte was aware of, and objected to, his wrongful seizure, arrest, and imprisonment on March 7, 2007, and his continued imprisonment in the Leon County Jail for a period of more than six (6) weeks immediately following.

104.    Had Defendant Mahoney's "Arrest / Probable Cause Affidavit" dated March 6, 2007, been truthful, and not contained the materially false statements implicating Kelley Harte for the murder of his wife, Barbara Harte, as set forth more fully in paragraphs 60 through 75 above, and / or had Defendant Mahoney not omitted from his "Arrest / Probable Cause Affidavit" dated March 6, 2007, the materially relevant facts contained in the TPD investigation relating to Barbara Harte's death, as set forth more fully above in paragraphs 76 through 86, Defendant Mahoney's "Arrest / Probable Cause Affidavit" dated March 6, 2007 would not have established probable cause to believe Kelley Harte murdered his wife, Barbara Harte, and accordingly, the March 7, 2007, arrest warrant which resulted in Kelley Harte being wrongfully seized, arrested and imprisoned in the Leon County Jail for more than six (6) weeks on a charge of having murdered his wife, Barbara Harte, would not have been issued.

105.    Defendant Mahoney deliberately or through reckless indifference, misused his power, possessed by virtue of state law and made possible only because Defendant Mahoney was clothed with the authority of state law, and in so doing caused to occur, under the color of state law, the violations of Plaintiff Kelley Harte's Constitutional rights as set forth herein, and are therefore, actionable under Title 42 U.S.C. Section 1983.

106.     Plaintiff Kelley Harte is entitled to relief against Defendant Mahoney, because Defendant Mahoney intentionally or through a reckless disregard for the truth, unlawfully caused Plaintiff Kelley Harte to be seized, arrested and imprisoned in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

107.     As a direct and proximate result of Defendant Mahoney's violations of Plaintiff Kelley Harte's civil rights, including Plaintiff Kelley Harte's rights under the Fourth and Fourteenth Amendments to the United States Constitution as set forth herein, Defendant Mahoney caused Plaintiff Kelley Harte to suffer physical injury, pain, medical expenses, loss of liberty, loss of the full enjoyment of life, mental anguish, emotional distress, humiliation, ridicule, embarrassment, damage to his business reputation as a small business owner, and pecuniary losses as more fully set forth above in paragraphs 91 through 97 of this Second Amended Complaint, as well as to incur attorneys' fees, costs and expenses defending against his wrongful murder charge and related seizure , arrest and imprisonment in the Leon County Jail.

108.     The personal injuries and damages suffered by Plaintiff Kelley Harte, as set forth above in paragraph 107, have continued through the present, and Plaintiff Kelley Harte will continue to suffer these damages in the future.

109.     Because Defendant Mahoney acted with actual and legal malice as set fourth herein, Plaintiff Kelley Harte is entitled to an award of punitive damages.

110.     In order to pursue his rights, and to recover his damages, as set forth in Count I of this Second Amended Complaint, it was necessary for Plaintiff Kelley Harte to retain the undersigned attorney and his law firm to provide legal representation, and in so doing Plaintiff, Kelley Harte has entered into a contract with the undersigned attorney and his law firm,

obligating Kelley Harte to pay attorneys' fees and costs associated with his legal representation in this lawsuit.

111.    Pursuant to 42 U.S.C. §1988, Plaintiff Kelley Harte is entitled to an award of a reasonable amount of attorneys' fees along with the costs incurred in prosecuting this case.

**WHEREFORE,** Plaintiff, RICHARD KELLEY HARTE, prays for judgment against Defendant JEFF MAHONEY, individually, as set forth below.

## COUNT II:
## MALICIOUS PROSECUTION
## VIOLATION OF TITLE 42 U.S.C. § 1983
## (Defendant Jeff Mahoney, Individually)

112.    Plaintiff Kelley Harte realleges and incorporates paragraphs 1 through 97, 99 through 102 and 104 through 105 above, as though fully set forth herein.

113.    Plaintiff Kelley Harte is entitled to relief against Defendant Mahoney, because Defendant Mahoney intentionally or through a reckless disregard for the truth, unlawfully caused Plaintiff Kelley Harte to be seized, arrested and imprisoned in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

114.    Defendant Mahoney was directly and actively involved in the initiation of criminal proceedings wherein Plaintiff Kelley Harte was charged with having murdered his wife, Barbara Harte.

115.    Defendant Mahoney lacked probable cause to charge Plaintiff Kelley Harte with the murder of his wife Barbara Harte, thereby causing Plaintiff Kelley Harte to be seized, arrested and imprisoned on a charge of first degree murder for which Plaintiff Kelley Harte could have been sentenced to death or life in prison.

116. Notwithstanding the Defendant Mahoney's violations of Kelley Harte's rights under the Fourth and Fourteenth Amendments to the United States Constitution, which resulted in Plaintiff's Kelley Harte' seizure, arrest and imprisonment in the Leon County Jail and prosecution for the alleged murder of his wife, Barbara Harte, State Attorney Meggs, upon learning of the intentional and / or reckless misrepresentations in Defendant Mahoney's "Arrest / Probable Cause Affidavit," immediately filed a *Nolle Prosequi* thereby dismissing all charges against Plaintiff Kelley Harte and causing him to be released from imprisonment.

117. As a direct and proximate result of Defendant Mahoney's intentional and / or reckless violations of Plaintiff Kelley Harte's rights under the Fourth and Fourteenth Amendments to the United States Constitution as described above, Defendant Mahoney caused Plaintiff Kelley Harte to suffer physical injury, pain, medical expenses, loss of liberty, loss of the full enjoyment of life, mental anguish, emotional distress, humiliation, ridicule, embarrassment, damage to his business reputation as a small business owner, and pecuniary losses as more fully set forth above in paragraphs 91 through 97 of this Second Amended Complaint, as well as to incur attorneys' fees, costs and expenses defending against his wrongful murder charge and related seizure , arrest and imprisonment in the Leon County Jail.

118. The personal injuries and damages suffered by Plaintiff Kelley Harte, as set forth above in paragraph 117, have continued through the present, and Plaintiff Kelley Harte will continue to suffer these damages in the future.

119. Because Defendant Mahoney acted with actual and legal malice as set fourth herein, Plaintiff Kelley Harte is entitled to an award of punitive damages.

120. In order to pursue his rights, and to recover his damages, as set forth in Count II of this Second Amended Complaint, it was necessary for Plaintiff Kelley Harte to retain the

undersigned attorney and his law firm to provide legal representation, and in so doing Plaintiff, Kelley Harte has entered into a contract with the undersigned attorney and his law firm, obligating Kelley Harte to pay attorneys' fees and costs associated with his legal representation in this lawsuit.

121.    Pursuant to 42 U.S.C. §1988, Plaintiff Kelley Harte is entitled to an award of a reasonable amount of attorneys' fees along with the costs incurred in prosecuting this case.

**WHEREFORE,** Plaintiff, RICHARD KELLEY HARTE, prays for judgment against Defendant JEFF MAHONEY, individually, as set forth below.


**COUNT III:**
**FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE LAW ENFORCEMENT OFFICERS**
**AND**
**WRONGFUL POLICIES, CUSTOMS AND PRACTICES**
**VIOLATION OF TITLE 42 U.S.C. § 1983**
**(City of Tallahassee, Florida)**

122.    Plaintiff Kelley Harte realleges and incorporates paragraphs 1 through 97, above, as though fully set forth herein.

123.    Plaintiff Kelley Harte is entitled to relief against Defendant City of Tallahassee because the City of Tallahassee was deliberately indifferent in the training, supervision, and discipline of the Tallahassee Police Department's law enforcement officers, and permitted and / or failed to prevent the Tallahassee Police Department from maintaining and / or following policies and procedures, custom and practices that forseeably caused Plaintiff Kelley Harte to be unlawfully seized, arrested and imprisoned against his will and in violation of his Constitutional rights under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

124.    At all times material hereto, Defendant City of Tallahassee, acting through duly assigned chiefs, supervisors and managers of the Tallahassee Police Department, was charged with the constitutional duty of responsibly hiring, screening, training, supervising, monitoring and disciplining law enforcement officers employed by the City of Tallahassee.

125.    Defendant City of Tallahassee, through the Tallahassee Police Department, employed policies and procedures, customs and practices that condoned or acquiesced in wrongdoing by law enforcement officers in the City of Tallahassee's employ, and failed to train and / or supervise its law enforcement officers, and failed to investigate and / or monitor the actions of its law enforcement officers, to prevent such abuses.

126.    At all times material hereto, Defendant City of Tallahassee, through its law enforcement chiefs, supervisors and managers, either expressly or impliedly acknowledged and assented to the failure to train and / or supervise and / or control law enforcement officers employed by the City of Tallahassee, including but not limited to, Defendant Mahoney, for dangerous propensities, lack of training or skill, or other indications of improper conduct in the performance of their duties.

127.    Specifically, the City of Tallahassee over-valued the "solving" of crimes, understood to mean a reported crime resulting in an arrest, while exercising little or no corresponding review of the internal process, including the following:

　　　　A.    Inadequate auditing of investigative paperwork to determine whether or not investigative reports were factually consistent;

　　　　B.    Inadequate internal review of cases where charges were dropped because the information provided to the constituted authorities turned to be false; and,

　　　　C.    Inadequate internal review of the supervisory oversight exercised in connection with problematic law enforcement investigations, to determine whether or not such investigations were given a timely and appropriate level of review based on the matters alleged.

128.     At all times relevant to this lawsuit the policies, practices and customs of the City

of Tallahassee's Police Department relating to supervisory oversight and review of law

enforcement officers investigating, charging, seizing, arresting and confining persons alleged to

have committed serious crimes, including murder, permitted such supervisory oversight and

review to be carried out in a superficial and untimely manner, including but not limited to the

following:

>      A.      Approving a subordinate law enforcement officer's "Arrest /
> Probable Cause Affidavit" which is to be used to charging, seizing, arresting, and
> imprisoning an individual for a serious crime, including murder, before the
> investigative report upon which the "Arrest / Probable Cause Affidavit" is
> allegedly based has undergone an adequate supervisory review and been
> approved;
>
>      B.      Permitting a person to be charged, seized, arrested and imprisoned
> for allegedly committing a serious crime, including the crime of murder, without
> first conducting a supervisory review of the criminal investigation giving rise to
> the said serious criminal charges, including murder; and,
>
>      C.      Failing to conduct a thorough and timely supervisory review of
> criminal investigations involving alleged serious crimes, including murder, and
> comparing same with the assertions in a law enforcement officer's related "Arrest
> / Probable Cause Affidavit" to be used in obtaining an arrest warrant for an
> individual being charged, seized, arrested and imprisoned for the alleged serious
> crime, to ensure the investigative report supports the assertions in the proposed
> "Arrest / Probable Cause Affidavit."

129.     The aforesaid conduct was part of an official policy, custom, practice or pattern of

conduct of the City of Tallahassee's Police Department, which resulted in the deprivation of

Plaintiff Kelley Harte's Fourth and Fourteenth Amendment rights under the United States

Constitution, causing or significantly contributing to the substantial injuries suffered by Plaintiff

Kelley Harte, as alleged in this Second Amended Complaint.

130.     Plaintiff Kelley Harte was a victim of the abuses of the lawful authority set forth

above in paragraphs 125 – 129, and the violations of Plaintiff Kelley Harte's rights under the

41

Fourth and Fourteenth Amendments to the United States Constitution as set forth herein, were the foreseeable result of the previously described policies, procedures and / or customs of Defendant City of Tallahassee's Police Department.

131.    As a direct and proximate result of the policies, practices, procedures and / or customs described above, Plaintiff Kelley Harte has suffered physical injury, pain, medical expenses, loss of liberty, loss of the full enjoyment of life, mental anguish, emotional distress, humiliation, ridicule, embarrassment, damage to his business reputation as a small business owner, and pecuniary losses as more fully set forth above in paragraphs 91 through 97 of this Second Amended Complaint, as well as attorneys' fees, costs and expenses defending against his wrongful murder charge and related seizure, arrest and imprisonment in the Leon County Jail.

132.    The personal injuries and damages suffered by Plaintiff Kelley Harte, as set forth above in paragraph 131, have continued through the present, and Plaintiff Kelley Harte will continue to suffer these damages in the future.

**WHEREFORE,** Plaintiff, RICHARD KELLEY HARTE, prays for judgment against Defendant CITY OF TALLAHASSEE, as set forth below.


## COUNT IV:
## WRONGFUL INTENTIONAL TORTS UNDER STATE LAW
### (City of Tallahassee, Florida)


133.    Plaintiff Kelley Harte realleges and incorporates paragraphs 1 through 97, above, as though fully set forth herein.

134.    In the alternative, Plaintiff Kelley Harte is entitled to Judgment against Defendant City of Tallahassee because:

A.    Defendant Mahoney, an employee of Defendant City of Tallahassee, acting within the course and scope of his employment, caused Plaintiff Kelley Harte to be

42

falsely imprisoned, but without malice toward Plaintiff Kelley Harte or disregard for Plaintiff Kelley Harte's rights under the Constitution of the United States;

B.     Defendant Mahoney, an employee of Defendant City of Tallahassee, acting within the course and scope of his employment, caused Plaintiff Kelley Harte to be deprived of his property, but without malice toward Plaintiff Kelley Harte or disregard for Plaintiff Kelley Harte's rights under the Constitution of the United States;

C.     Defendant Mahoney, an employee of Defendant City of Tallahassee, acting within the course and scope of his employment, withheld evidence and made misstatements in Plaintiff Kelley Harte's "Arrest / Probable Cause Affidavit," but without malice toward Plaintiff Kelley Harte or disregard for Plaintiff Kelley Harte's rights under the Constitution of the United States

135.    As a direct and proximate result of the acts described above, Plaintiff Kelley Harte has suffered physical injury, pain, medical expenses, loss of liberty, loss of the full enjoyment of life, mental anguish, emotional distress, humiliation, ridicule, embarrassment, damage to his business reputation as a small business owner, and pecuniary losses as more fully set forth above in paragraphs 91 through 97 of this Second Amended Complaint, as well as attorneys' fees, costs and expenses defending against his wrongful murder charge and related seizure , arrest and imprisonment in the Leon County Jail.

136.    The personal injuries and damages suffered by Plaintiff Kelley Harte, as set forth above in paragraph 135, have continued through the present, and Plaintiff Kelley Harte will continue to suffer these damages in the future.

**WHEREFORE,** Plaintiff, RICHARD KELLEY HARTE, prays for judgment against Defendant CITY OF TALLAHASSEE, as set forth below.

### COUNT V:
### NEGLIGENCE UNDER STATE LAW
### (City of Tallahassee, Florida)

137.    Plaintiff Kelley Harte realleges and incorporates paragraphs 1 through 97, above, as though fully set forth herein.

43

138.    At all times relevant to this Second Amended Complaint, Defendant City of Tallahassee, through its officers and agents, had a duty to exercise reasonable care to responsibly hire, screen, train, supervise, discipline, and control law enforcement officers of the Tallahassee Police Department, and with regard to tort claims, the Defendant City of Tallahassee is responsible for the acts and omissions of its law enforcement officers carried out in the course and scope of their duties as sworn law enforcement officers.

139.    Defendant City of Tallahassee breached its duty of care in that it negligently promulgated and / or negligently employed policies, procedures, practices and / or customs that encouraged wrongdoing by law enforcement officers employed by the City of Tallahassee.

140.    Defendant City of Tallahassee breached its duty of care in that it negligently failed to train and / or supervise and / or monitor the actions of its law enforcement officers to prevent the abuses more fully set forth above in paragraphs 98 through 111 and 112 through 121.

141.    At all times relevant to this Second Amended Complaint, Defendant City of Tallahassee, through its final policymakers, including its policymakers assigned to the Tallahassee Police Department, breached its duty of care in that it negligently acknowledged and assented to the failure to screen, supervise, control and discipline law enforcement officers of the Tallahassee Police Department including, but not limited to Defendant Mahoney, regarding the propensity to violate the Constitutional rights of criminal suspects to secure arrests, as well as other characteristics indicative of carrying out their duties as law enforcement officers in a manner contrary to the established Constitutional rights of the individuals they have sworn to protect and the laws they have sworn to uphold.

44

142.    Specifically, the City of Tallahassee negligently over-valued the "solving" of crimes, understood to mean a reported crime resulting in an arrest, while exercising little or no corresponding review of the internal process, including the following:

A.    Inadequate auditing of investigative paperwork to determine whether or not investigative reports were factually consistent;

B.    Inadequate internal review of cases where charges were dropped because the information provided to the constituted authorities turned out to be false; and,

C.    Inadequate internal review of the supervisory oversight exercised in connection with problematic law enforcement investigations, to determine whether or not such investigations were given a timely and appropriate level of review based on the matters alleged.

143.    At all times relevant to this lawsuit the policies, practices procedures and customs of the City of Tallahassee's Police Department relating to supervisory oversight and review of law enforcement officers investigating, charging, seizing, arresting and confining persons alleged to have committed serious crimes, including murder, negligently permitted such supervisory oversight and review to be carried out in a superficial and untimely manner, including but not limited to the following:

A.    Approving a subordinate law enforcement officer's "Arrest / Probable Cause Affidavit" which is to be used to charging, seizing, arresting, and imprisoning an individual for a serious crime, including murder, before the investigative report upon which the "Arrest / Probable Cause Affidavit" is allegedly based has undergone an adequate supervisory review and been approved;

B.    Permitting a person to be charged, seized, arrested and imprisoned for allegedly committing a serious crime, including the crime of murder, without first conducting a supervisory review of the criminal investigation giving rise to the said serious criminal charges, including murder; and,

C.    Failing to conduct a thorough and timely supervisory review of criminal investigations involving alleged serious crimes, including murder, and comparing same with the assertions in a law enforcement officer's related "Arrest / Probable Cause Affidavit" to be used in obtaining an arrest warrant for an individual being charged, seized, arrested and imprisoned for the alleged serious

45

crime, to ensure the investigative report supports the assertions in the proposed "Arrest / Probable Cause Affidavit."

144.    Defendant City of Tallahassee negligently, facilitated or acquiesced or condoned the aforesaid misconduct engaged in by Defendant Mahoney and others under the control of the City of Tallahassee, which was part of an official policy, custom, practice or pattern of conduct of Defendant City of Tallahassee, directly causing Plaintiff Kelley Harte injuries.

145.    As a direct and proximate result of the negligent acts and omissions described above, Plaintiff Kelley Harte has suffered physical injury, pain, medical expenses, loss of liberty, loss of the full enjoyment of life, mental anguish, emotional distress, humiliation, ridicule, embarrassment, damage to his business reputation as a small business owner, and pecuniary losses as more fully set forth above in paragraphs 91 through 97 of this Second Amended Complaint, as well as to incur attorneys' fees, costs and expenses defending against his wrongful murder charge and related seizure , arrest and imprisonment in the Leon County Jail.

146.    The personal injuries and damages suffered by Plaintiff Kelley Harte, as set forth above in paragraph 145, have continued through the present, and Plaintiff Kelley Harte will continue to suffer these damages in the future.

**WHEREFORE,** Plaintiff, RICHARD KELLEY HARTE, prays for judgment against Defendant CITY OF TALLAHASSEE, as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, RICHARD KELLEY HARTE, seeks Judgment as follows:

A.    Compensatory damages against each of the Defendants herein;

B.    Punitive damages against Defendant Mahoney;

C.    Pre-judgment interest on all economic losses;

D.      Attorneys' fees pursuant to 42 U.S.C. Section 1988 and costs of litigation;

E.      Trial by jury on all issues so triable; and,

F.      Such other relief as this Honorable Court deems just under the circumstances.

DATED this 1st day of August, 2011.

                          Respectfully submitted,

                          MOYÉ LAW FIRM
                          527 E. Park Avenue
                          Tallahassee, FL 32301
                          Voice - (850) 224-MOYE (6693)
                          Fax -    (850) 222-MOYE (6693)

                          *David W. Moyé*

                          DAVID W. MOYÉ
                          Fla. Bar No: 0782350
                          TRACY P. MOYÉ
                          Fla. Bar No: 0782361
                          Attorneys For Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Plaintiff's "Second Amended Complaint" has be provided to Michael P. Spellman and Brett M. Waronicki, counsel for Defendants City of Tallahassee and Jeff Mahoney, using the CM/ECF System, which will deliver an electronic copies to Michael P. Spellman, mspellman@sniffenlaw.com, and Brett M. Waronicki, bwaronicki@sniffenlaw.com, Sniffen & Spellman, P.A., 123 North Monroe Street, Tallahassee, Florida 32301, on this 1st day of August, 2011.

                          *David W. Moyé*
                          DAVID W. MOYÉ

47

# In the Leon Court
# Leon County, Florida

|  |  |
|---|---|
| STATE OF FLORIDA | SPIN # 160052 |
| vs. | REF # 2535 |
|  | Warrant # 2007GF-893A |
|  | Agency Case # 06-36346 |
| Richard Kelley Harte          **WARRANT** | Officer I.D. # 535 |
|  | Charge: 1st Degree Murder |
| 5399 Pembridge Place | Degree of Charge: LF |
|  | Statute Nos.: 782.04(1) |
|  | DOB: 9/28/58 |

SPIN # 160052
REF # 2535
Warrant # 2007GF-893A
Agency Case # 06-36346
Officer I.D. # 535
Charge: 1st Degree Murder
Degree of Charge: LF
Statute Nos.: 782.04(1)
DOB: 9/28/58
Sex: Male
Race: White
Height: 6
Weight: 215
Hair: Black
Eyes: Unknown
SSN: 261570143

**STATE OF FLORIDA**
vs.

**Richard Kelley Harte**          **WARRANT**

**5399 Pembridge Place**

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

Before me, the undersigned authority, personally appeared Investigator J. Mahoney , who, being first duly sworn says that on the 19th day of November, 2006, in Leon County, Florida, the aforesaid did unlawfully kill a human being, Barbara Harte, by drowning, and the killing was perpetrated from or with a premeditated design or intent to effect the death of Barbara Harte,

contrary to Section, 782.04(1) F.S.

contrary to the statute, rule, regulation or other provision of law in such case made and provided, and against the peace and dignity of the State of Florida.

THESE ARE, THEREFORE, to command you to arrest instanter the aforesaid defendant and bring him or her before me to be dealt with according to law.

Given under my hand and seal this ___7th___ day of ___March___ , 20_07_ .

_____Tom Bateman Leon_____ (SEAL)
County Court Judge          County

Circuit Judge

WARRANT

A Certified Copy
Attest:

**Bob Inzer**
Clerk Circuit Court
Leon County, Florida

By_____ D.C.
7-19-11

EXHIBIT
**1**

## PROBABLE CAUSE

CASE #: 06-36346

TO:            FIRST APPEARANCE MAGISTRATE
DEFENDANT:   Richard Kelley Harte
CHARGES:      1st Degree Murder

**The above named defendant was arrested for the following reasons:**
On Sunday November 19th 2006 the Tallahassee Police Department
responded to 5399 Pembridge Place in reference to a drowning. Ofc.
Brannon #510 stated that he arrived on scene at 5:59am and eight-year-
Anderson Harte, answered the front door. Ofc. Brannon entered the
residence and observed the discovering person, Richard Kelley Harte,
standing in the hallway. Mr. Harte led Ofc. Brannon into the master
bathroom. The victim, Barbara Harte, was lying on the ground next to the
bathtub. The plug for the bathtub was broken and the water was slowly
draining. The victim was unconscious and not wearing any clothing. Her
hair was wet and she was slightly blue in the face. The victim's 19-year-old
daughter Alison Harte was attempting CPR on the victim. Ofc. Brannon was
unable to detect a heartbeat or any signs of breathing. The victim was
transported to Tallahassee Memorial Hospital where she was pronounced
dead.

Dr. Stewart performed an autopsy and the findings revealed that the cause of
death was determined to be drowning. The victim had three separate acute
blunt force injuries to her head. There are three distinct and separate areas of
subscalpular hemorrhage present that correspond specifically to the area of
the left upper forehead, the midline posterior scalp and left posterior lateral
scalp. The victim's body had evidence of recent and past bruising. Dr.
Stewart advised that Fresh hemorrhage/bruising was located on the victim's
left outer hand, left rear triceps area, left forearm, left bicep, left elbow, left
upper forehead, right rear triceps, right outer hand, right forearm which also
contained an abrasion. The bruising is indicative of the victim having been
involved in a struggle. The victim also had older bruises present on her right
and left thighs, shin area and the back of her left leg. She had old scarring on
the back of her head. The victim had a bed sore on her lower back near her
tailbone. Just above the sore was a small abrasion. Old rib fractures were
also present. A toxicology report determined that the victim had a high level
of alcohol and cocaine in her system.

On 8/29/06 the victim went to her primary physician Dr. Rosner for a
scheduled appointment. During the examination Dr. Rosner noticed bruising
that appeared suspicious. When she questioned the victim about the bruising

## PROBABLE CAUSE

CASE #: 06-36346

TO:                 FIRST APPEARANCE MAGISTRATE
DEFENDANT:   Richard Kelley Harte
CHARGES:       1st Degree Murder

the victim told her the injuries were the result of being thrown around by her
husband Richard Harte. The victim told Dr. Rosner that a previous doctor's
visit regarding a chest injury was also caused by being abused by her
husband. Dr. Rosner contacted the Tallahassee Police Department and Ofc.
Bradshaw responded (TPD#06-26767). The victim was hesitant to talk with
Ofc. Bradshaw because she did not want her husband finding out she spoke
with police. When asked why, the victim said that her husband told her no
one would believe her, that he would lie about the incidents and that he
would leave her with nothing. The victim continually made excuses for her
husband's behavior, saying that he had never punched her. She said he only
slapped her, kicked her, and threw her into the ground and furniture. The
victim said her husband only became violent when he had been drinking.
The victim said the physical abuse started approximately 6 months ago. The
victim said her husband has been verbally abusive for years and he has
restricted her movements by saying she could not go out with her friends.
The victim said her husband controls who she talks to and when.

The first incident of abuse the victim recounted was approximately 6 months
ago. Her husband threw a frozen juice bar at her striking her in the mouth.
The impact caused a chipped tooth and a broken crown. The victim went to
her dentist Dr. Barr to be treated and she told Dr Barr she was hit in the
mouth with a football during a family game. The second incident occurred a
few weeks later when her husband pushed her down causing her head to hit
the back of the dresser. The fall caused a bleeding wound that her husband
did not allow her to seek medical attention for. The victim showed Ofc.
Bradshaw a scar on the back of her head from the incident. Approximately 4
weeks before her doctor's appointment the victim was going on a beach trip.
The victim and her husband were lying in bed and he was snoring. The
victim told her husband to be quiet and he struck her with a pillow. The
victim said, "Ouch", when it happened and he told her something to the effect
of, "That didn't hurt, I'll show you what hurts." He then kicked her in the leg
striking her in the inner thigh with his foot. The victim said she was upset
because she could not wear a bathing suit at the beach the next week. While
at the beach her husband pushed her down during an argument. This caused
great pain in her knee that was still red and swollen several weeks later. Dr.
Rosner scheduled an X-ray to determine the extent of the damage.

## PROBABLE CAUSE

CASE #: 06-36346

| | |
|---|---|
| TO: | FIRST APPEARANCE MAGISTRATE |
| DEFENDANT: | Richard Kelley Harte |
| CHARGES: | 1st Degree Murder |

The victim said the primary cause of their arguments that lead to the physical violence is when she doesn't feel like engaging in sexual activity with him. The victim said her husband is only physical when he drinks and he has been drinking more frequently. Ofc. Bradshaw documented bruising on the victim's upper thigh and digital photographs were taken of her injuries. On 9/5/06 Inv. Besse attempted to follow up with the victim by calling her workplace. The victim called Inv. Besse back and appeared very upset. She told Inv. Besse that she did not know how she was going to explain a police officer calling her and her husband's workplace. She told Inv. Besse that she did not want her husband arrested and she did not want the police calling her husband's workplace anymore.

Mr. Harte was interviewed three times in reference to this case. Mr. Harte stated that on Saturday 11/18/06 he and his wife Barbie woke up and she made him breakfast. His son Anderson and his daughter Alison went to the Florida State football game. Mr. Harte and Barbie stayed home during the football game and watched football on television. Mr. Harte said he and his wife had a good afternoon together. Mr. Harte went food shopping at Wal-Mart at approximately 6:30pm or 7:00pm. While he was out he stopped by his office and ABC Liquor to purchase a bottle of Maker's Mark Liquor. He returned home at approximately 8:30pm or 9:00pm. Mr. Harte said when he returned home Barbie was lying in bed watching television. Mr. Harte said Barbie was acting normal. Mr. Harte said his children were home watching television in the TV room. Mr. Harte began putting the groceries away. Mr. Harte said he cleaned up the kitchen and then went and took a shower. Mr. Harte said at approximately 11:00pm-11:30pm the kids fell asleep on the couch so he sent them to bed upstairs.

Mr. Harte said he and Barbie were watching television in the master bedroom like they always did. Mr. Harte said they were watching something like ESPN and then they began watching the movie Horse Whisperer. Mr. Harte said he was not sure what channel the movie was on. Mr. Harte said his daughter Alison told him that the Horse Whisperer ended at 2:00am. Mr. Harte said after the Horse Whisperer was over they started flipping through channels and Barbie "kind of fell asleep." Mr. Harte said he started

| PROBABLE CAUSE | |
|---|---|
| | CASE #: 06-36346 |
| TO:             FIRST APPEARANCE MAGISTRATE | |
| DEFENDANT:    Richard Kelley Harte | |
| CHARGES:       1st Degree Murder | |

watching recaps of sports. Mr. Harte stated, "After that we kind of dozed off." Mr. Harte said Barbie woke up and stated, "Can you rub my back, my back hurts, and my left shoulder is hurting." Mr. Harte said Barbie had been having shoulder pain since the beginning of the week. Mr. Harte told his wife she should soak her shoulder in the bathtub. Mr. Harte went in and drew her a bath while Barbie was still in the bed.

Barbie sat in the tub for a while with the jets off. Barbie turned the jets on then she turned them off. She asked for Mr. Harte to come to her and he did. She got out and sat at the edge of the bathtub and asked Mr. Harte to rub her back. Mr. Harte said he rubbed Barbie's back near her back and shoulder blades. Barbie sat back in the water and told him she would be out in a few minutes. Mr. Harte left the bathroom and for privacy he closed the bathroom door half way. (The bathroom door is a wooden glider door leading from the bathroom to the master bedroom). Mr. Harte went and sat in his chair, which is located next to the fireplace. Mr. Harte said he sat down and "really did not pay attention to the TV." Mr. Harte said 15-20 minutes later he could still here the jets running in the bathroom. Mr. Harte walked into the bathroom and saw Barbie under water. He turned off the jets and pulled Barbie out of the bathtub. Mr. Harte tried to push Barbie sideways and push on her chest. He turned Barbie on her side and water started pouring out of her mouth. Mr. Harte said he started pumping on her back and chest and he started CPR. Mr. Harte said he was doing mouth-to-mouth breaths and water was coming out of her mouth. Mr. Harte started screaming and his daughter came down. Mr. Harte said everything happened so fast and 30 seconds later his daughter Alison was down stairs. Mr. Harte said he told his daughter to call 911. According to the dispatch notes the call was received at 5:51am. Mr. Harte said Alison assisted with CPR from the instructions given by the operator on the phone.

Mr. Harte said Barbie was not on any prescribed medication and she was not taking any sleeping pills. Mr. Harte said Barbie had one drink during the night and the glass was located ¾ full a few feet from the bathtub. I asked Mr. Harte if Barbie had ever had any effect from alcohol that caused her to pass out or be drowsy. Mr. Harte said, "She would not just pass out." Mr. Harte denied ever physically abusing Barbie. Mr. Harte said he and Barbie

| PROBABLE CAUSE | |
|---|---|
| | CASE #: 06-36346 |
| TO:         FIRST APPEARANCE MAGISTRATE | |
| DEFENDANT:   Richard Kelley Harte | |
| CHARGES:     1st Degree Murder | |

have been married for 23 years and they have their normal verbal arguments. Mr. Harte said Barbie has tried cocaine in the past but he has not seen her use drugs recently. Mr. Harte said he has an alarm system. Mr. Harte said all the doors were locked in the residence and he only arms the alarm when he leaves. Mr. Harte said he was the only person in the bedroom before and at the time Barbie was found deceased.

Melissa Ooten stated that she and Barbie were friends from bible study. Ooten recalled a prior incident when the victim had bruises on her face. At that time the victim told Ooten that she fell. The victim eventually confided in Ooten stating that her husband physically abused her. The victim talked about being physically abused on 2-3 separate occasions. The victim seemed embarrassed to admit she was being abused and planned to arrange couples counseling. The victim told Ooten that her husband would go out to bars and come home and he would abuse her.

Dr. Hogan and Dr. Rosner were the victim's primary physicians. Dr. Hogan said the victim came to her office sometime before August of 2006 complaining of a sore hip and bruising. The victim denied that she was abused and said she received the injury after falling off the bed while having sex. Dr. Hogan remained suspicious of domestic violence. Dr. Hogan said the victim was becoming very isolated from her friends over the past year. Dr. Rosner stated that she has suspected domestic violence several times. Since 2001 the victim had come in for several visits with random injuries: Head, chest, finger, right side of body injuries, etc. Dr. Rosner said the victim always had an excuse about either falling down in the garage, falling while having sex or insect bites.

Daleen Gilpin is a kindergarten teacher at Celebration Baptist Church. In 2003-2004 Gilpin was Anderson Harte's kindergarten teacher. One morning when the students assembled Gilpin asked if anyone had a prayer request. Anderson raised his hand and asked the class to pray for his mommy because his daddy hit her. Anderson told Gilpin that he was lying in bed with his parents when his father hit his mother in the face. Gilpin spoke with the victim about her concerns and the victim admitted that her husband struck her but she was guarded in her responses. Patty Kilgore the school administrator

| PROBABLE CAUSE | |
|---|---|
| | CASE #: 06-36346 |
| TO: FIRST APPEARANCE MAGISTRATE | |
| DEFENDANT: Richard·Kelley Harte | |
| CHARGES: 1st Degree Murder | |

spoke with the victim about the abuse. The victim told Kilgore that her
husband often stayed out late into the early morning hours and came home
drunk. It was during these times that they had bad altercations with things
being thrown. The victim told Kilgore that her husband completely changes
when he drinks.

Joscelyn Capece has been the victim's hairdresser for 7 years. Capece said
the victim had a lot of injuries and usually had outlandish stories about how
she was injured. Capece said on one occasion the victim had severe injury to
her scalp and had to cancel her hair appointment. On Saturday 11/4/06 the
victim came to get her hair done. The victim told Capece that things with her
husband were really bad. The victim told Capece that her husband gets drunk
and abuses her every night. The next day her husband would apologize and
he would do it again. The victim told Capece that she also received injuries
during sex. The victim said she spoke to her brother about leaving her
husband but she feared that she did not have enough money to leave. The
victim said she has attempted to save money so she could leave her husband.
Capece said she began seeing injuries over the past 4 years but it seemed to
be really serious over the past 2 years.

Many Brown is a long time friend of the victim. Brown stated that in August
of 2006 she received several voicemails from the victim. The messages
consisted of statements from the victim "I've got to get out of here, I can't
see anybody, I'm a prisoner, my husband is on drugs and he is crazy." The
Browns begged the victim to come to Arizona and stay with them. The
Browns said in late August 2006 the victim told them she filed a report with
police. In late August 2006 Brown spoke with the victim via telephone. The
victim told Brown that physical abuse had been going on for years and she
was afraid her husband was going to kill her. The victim said her husband
was staying out all night drinking and using drugs. When he came home he
would physically abuse her. The victim told Brown that her brother was
helping her leave her husband. The victim told Brown that she could not
leave her husband because she was worried about the kids and he promised to
do better.

| PROBABLE CAUSE | |
|---|---|
| | CASE #: 06-36346 |
| TO: | FIRST APPEARANCE MAGISTRATE |
| DEFENDANT: | Richard Kelley Harte |
| CHARGES: | 1st Degree Murder |

Karen Johnson is a close friend of the victim. Johnson said the Harte's had a
difficult marriage. Mr. Harte would stay out all night and took little interest
in the kid's lives. Johnson said she noticed bruising and injuries on the
victim. The victim always explained them as falls or accidents. The victim
told Johnson that her husband had a drug problem. He would use cocaine
and give it to the victim when he "wanted to have fun." Johnson got the
impression that she meant rough sex. The victim confided in Johnson that
she documented a report of domestic violence with the police.

Kathy Jenson is the victim's sister in law. Kathy said approximately 6
months ago she started seeing bruises on the victim's body. The victim told
Kathy that Mr. Harte did not hit her he would only push her. Kathy said she
would periodically come to Tallahassee for business and to see the victim.
Kathy said Mr. Harte was never at home when she was in town visiting.
Kathy said the victim would always use the excuse that she fell into
something. Kathy said 3 months ago she received a phone call from the
victim. The victim told Kathy that she had rough sex with Mr. Harte and she
fell into the edge of the dresser and hit her head. The victim told Kathy that
she had a hole in her head and Kathy told her to go to the hospital. The
victim told Kathy that Mr. Harte would not let her. The victim said there was
a pool of blood on her pillow from the injury. Kathy said she saw the injury
to the victim's head when she went to Tallahassee two days later on business.
Kathy said Mr. Harte has been physically and verbally abusing the victim for
years. The victim told Kathy and her husband that she was going to leave
Mr. Harte. Kathy said the victim would always change her mind.

Daniel Strauss stated that he is a very close friend of the Hartes. On Saturday
11/18/06 at approximately 4:00am he was at the Harte's house. Strauss said
the three of them were drinking, using cocaine and having sex. Strauss said
he observed the victim naked and he only saw one bruise near the victim's
buttocks. Strauss said he did not observe any additional bruising on the
victim's body. Strauss said he left the house at approximately 7:30am.
Strauss said Mr. Harte called him on Sunday 11/19/06 at approximately
12:00am. Mr. Harte wanted Strauss to come to the house with another
girlfriend of his. Strauss said he wanted to stay in for the night and declined
the invitation. Strauss said the victim got on the phone and the two were

| PROBABLE CAUSE | |
|---|---|
| | **CASE #: 06-36346** |
| **TO:**           FIRST APPEARANCE MAGISTRATE | |
| **DEFENDANT:**   Richard Kelley Harte | |
| **CHARGES:**     1st Degree Murder | |

talking. Strauss said the victim and Mr. Harte were watching pornography on the television. Strauss said the victim commented on how lucky the woman on television was because she was having sex with two men. This was the same time Mr. Harte stated that he and his wife were watching the Horse Whisperer.

The victim's blood was sent for analysis. The victim's blood revealed that she had almost three times the legal limit of alcohol in her blood stream at the time of her death. This contradicts Mr. Harte's statement that the victim had only one drink. Her blood also showed a high level of cocaine, which contradicts Mr. Harte's statement that the victim had used cocaine in the past. Mr. Harte stated that he was with the victim the entire afternoon and evening. This also corroborates witness Strauss' statement that the victim had used cocaine as recent as the previous evening. The medical examiner advised that the bruising on the victim was consistent with her having been in a recent struggle, which is corroborated by Strauss' statement that he had not seen bruising on the victim the previous morning. The injuries on the victim's head are consistent with the victim's head having received three separate blunt force injuries shortly prior to her death. Mr. Harte's statement does not account for the victim's head injuries and he only indicated that the victim complained only of a sore shoulder. When Mr. Harte was told of the bruising on the victim his explanation was that the bruising must have occurred post mortem. Dr. Stewart advised that the injuries were at the time of or shortly before the victim's death.

Due to the statements of the victim's friends, family members, personal physicians, and others that had contact with her, the physical evidence on her body, the contradictions in Mr. Harte's statement and the results of the autopsy it appears that the victim died as a result of having been involved in a struggle with Mr. Harte. The victim was found by her bathtub and there were no indications on scene that the victim had fallen while taking a bath and according to Mr. Harte the victim made no statements that she had injured herself. Mr. Harte was within 15-20 feet of the bathroom and should have heard the victim if she fell in the tub. The bruising on the victim's arms are consistent with someone having held her down while in the bathtub, thus causing her to drown.

## PROBABLE CAUSE

CASE #: 06-36346

TO:               FIRST APPEARANCE MAGISTRATE
DEFENDANT:   Richard Kelley Harte
CHARGES:        1st Degree Murder

The preceding is true to the best of my present knowledge or belief.

SIGNATURE _J Mahony_   535    #535 Tallahassee Police Department

NOTARY/ASA _AM. S. B. Johnson 269 TP_ Law Enforcement Officer
Notarization: Sworn and subscribed before me this _6th_ of _March_.

ORDER:  THIS CAUSE coming before me as a First Appearance Magistrate, and having
reviewed the preceding Affidavits, find:

[✓] Probable cause sufficient;    [ ] Probable cause not sufficient and
unless corrected within seventy-two hours, the defendant shall be released
on his own recognizance.

Bond Amount Requested _____

_____
JUDGE SIGNATURE

Warrant approved by ASA  ROBIN LOTANE  on _____  via Email / telephone / in person.

# In the Leon Court
# Leon County, Florida

SPIN # 190052
REF # 2535
Warrant # 2007CF893A1
Agency Case # 06-36346
Officer I.D. # 535
Charge: 1st Degree Murder
Degree of Charge: LF
Statute Nos.: 782.04(1)
DOB: 9/28/58
Sex: Male
Race: White
Height: 6
Weight: 215
Hair: Black
Eyes: Unknown
SSN: 261570143

STATE OF FLORIDA
vs.

Richard Kelley Harte          COMPLAINT

5399 Pembridge Place

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

Before me, the undersigned authority, personally appeared Investigator J. Mahoney , who, being first duly sworn says that on the 19th

day of November, 2006, in Leon County, Florida, the aforesaid did unlawfully kill a human being, Barbara Harte, by drowning, and

the killing was perpetrated from or with a premeditated design or intent to effect the death of Barbara Harte.

: contrary to Section., 782.04(1) F.S.

contrary to the statute, rule, regulation or other provision of law in such case made and provided, and against the peace and dignity of the

State of Florida.

Investigator J. Mahoney
Complainant

Tallahassee Police Department
234 E. 7th Ave. Tallahassee, FL 32303
Address

Sworn to and subscribed before me this 6th day of March, 2007.

Judge, Assistant State Attorney or Notary Public

S E A L